UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

| | |
|---|---|
| TRASONIA ABBOTT, | **COMPLAINT** |
| | **23 cv 5152** |
| | **ECF Case** |
| Plaintiff, | |
| vs. | |
| The CITY OF NEW YORK, JOSEPH RODELLI, JOHN DOES, in their individual and official capacities, | **JURY TRIAL DEMANDED** |
| Defendants. | |

------------------------------------------------------------x

Plaintiff Trasonia Abbott, by their[1] attorney, Cyrus Joubin, complaining of the

Defendants, respectfully alleges as follows:

## PRELIMINARY STATEMENT

1. This action arises from various civil rights violations against Trasonia Abbott ("Plaintiff" or "Abbott") by New York City police officers. Plaintiff asserts constitutional claims pursuant to 42 U.S.C. § 1983 ("Section 1983") against the individual defendants for false arrest, excessive force, malicious prosecution, denial of the right to a fair trial, violation of substantive due process, failure to intervene, and a *Monell* claim against the City of New York for the same constitutional violations. Plaintiff seeks compensatory and punitive damages, costs, disbursements, and attorney's fees pursuant to applicable state and federal civil rights law.

## JURISDICTION

2. This action is brought pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988 and

---

[1] Abbott uses the gender-neutral pronoun "their" and "them" to refer to them.

the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution. Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331, 1343 (a)(3) and (a)(4), this being an action seeking redress for the violation of Plaintiff's constitutional and civil rights.

## VENUE

3. Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391(b) because the acts complained of occurred in this district.

## JURY DEMAND

4. Plaintiff respectfully demands a trial by jury on each and every one of their claims as pled herein, pursuant to Fed. R. Civ. P. 38(b).

## PARTIES

5. The individually named defendants – Joseph Rodelli and John Does (collectively, the "individual defendants") – are and were at all times relevant herein officers, employees and agents of the New York City Police Department ("NYPD").

6. Upon information and belief, on the date of the incident giving rise to this complaint, the individual defendants were assigned to the NYPD 6th Precinct.

7. Each individual defendant is sued in his or her individual and official capacity. At all times mentioned herein, each individual defendant acted under the color of state law, in the capacity of an officer, employee, and agent of defendant City of New York ("Defendant City").

8. Defendant City is a municipality created and authorized under the laws of New York State. It is authorized by law to maintain, direct, and to supervise the NYPD, which acts as its law enforcement agent and for which it is ultimately responsible.

## STATEMENT OF FACTS

9. On the night of May 13, 2021, Trasonia Abbott and their friends Kayla and Shantell were headed home from an Eid al Mubarak celebration in Manhattan.

10. Accompanying Abbott, Kayla and Shantell on the walk to the train station were Shantell's friends.

11. During the walk to the train station, Abbott peacefully played their Djembe drum.

12. Because the sidewalk in front of the NYPD 6th Precinct was blocked off by barricades, Abbott and their friends continued to walk on a pathway between the barricades.

13. Suddenly, and without justification, defendants Rodelli and John Does rushed toward Abbott and slammed and tackled them to the ground.

14. While on the ground, Abbott was arrested by Defendant Rodelli.

15. During the arrest, an officer was on Abbott's back while other officers surrounded Abbott.

16. The officers brutalizing Abbott were wearing body-cameras.

17. After being arrested, Abbott was taken inside the 6th Precinct.

18. When Abbott asked why they were being arrested, they were told that it was for "banging on cars."

19. When Abbott denied banging on cars, they were told, "Well then, resisting arrest."

20. Abbott neither banged on cars nor resisted arrest.

21. Abbott was held at Manhattan's 6th Precinct from approximately 11:30 pm on May 13, 2021, until their release at 7 am on May 14, 2021.

22. On May 14, at 4:15 am, after Abbott signed a release form known as a desk appearance ticket and had been told they'd soon be released, Abbott witnessed an officer telling arresting officer Rodelli, "Don't send it yet."

23. While detained at the precinct, Abbott was denied a phone call and denied access to the bathroom.

24. When they were finally allowed to use the bathroom, Abbott was escorted by an unknown female officer (with a name resembling "Nercy Burgos," upon information and belief).

25. The unknown female officer (Officer Jane Doe) did not give Abbott privacy and watched Abbott as they used the bathroom.

26. At approximately 7 am on May 14, Abbott was released with a desk appearance ticket (DAT Serial No. 006-00119) requiring them to appear on July 9, 2021 in New York County Criminal Court.

27. On July 9, 2021, Abbott appeared in New York County Criminal Court where they were arraigned on Docket No. CR-010299-21NY and charged with obstructing governmental administration in the second degree, resisting arrest, and disorderly conduct.

28. All of these criminal charges were false and fabricated, as Abbott was innocent and had engaged in no wrongdoing leading up to their arrest.

29. Defendant Rodelli falsely alleged in the criminal court complaint, among other things, that Abbott "walk[ed] down a public highway against vehicular traffic" and that Abbott physically resisted arrest, when, in fact, Abbott never walked against any "vehicular traffic" and never physically resisted their unlawful arrest.

30. On July 9, 2021, all of Abbott's criminal charges were dismissed and sealed.

**DELIBERATE ACTS UNDER COLOR OF STATE LAW**

31. All of the aforementioned acts of the individual defendants, their agents, servants and employees, were carried out under the color of state law in the course and scope of their duties.

32. All of the aforementioned acts deprived Plaintiff of the rights guaranteed to citizens of the United States by the Fourth, Fifth, Sixth, and Fourteenth Amendments to the Constitution of the United States of America, and in violation of 42 U.S.C. § 1983.

33. The individual defendants acted willfully, knowingly, and with the specific intent to deprive Plaintiff of their constitutional rights secured by 42 U.S.C. § 1983, and by the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

**FAILURE TO TRAIN AND SUPERVISE**

34. Upon information and belief, and based on the officers' vicious and ignorant conduct, the individual defendants' aforementioned abuse of power was not an isolated event. There were other instances of misconduct by the individual defendants that Defendant City knew or should have known about.

35. The NYPD failed to supervise and discipline the individual defendants despite their histories of malicious and mendacious behavior, ignoring the risk that they would engage in future misconduct, thereby encouraging them to continue to abuse their powers and violate the rights of civilians.

**NYPD'S CULTURE OF MENDACITY AND SHAM FALSE STATEMENT POLICY**

36. There is a systemic failure by the City to identify, discipline, and supervise NYPD officers who falsify information and fabricate criminal charges, a failure so widespread, obvious, and tolerated as to constitute a custom and policy of Defendant City.

37. The NYPD's flaccid response to lying officers constitutes a destructive custom and policy that fosters a culture of mendacity in the NYPD – a culture of mendacity that seeps into the criminal justice system.

38. Proportionate and appropriate discipline sends a message to NYPD officers that they are not above the law and are accountable to the people whom they serve.

39. But NYPD officers usually face only minor discipline or no discipline whatsoever for making false statement on official documents.

40. Investigating, controlling, and punishing this type of wrongdoing is the responsibility of the NYPD, but it is a responsibility the NYPD has utterly shirked.

41. In 1995, by Executive Order No. 18, Defendant City's Mayor created the Commission to Combat Police Corruption (the "Commission") to monitor and evaluate the NYPD's anti-corruption activities.  The Commission fulfills its mandate to monitor the NYPD's performance by reviewing the investigations of the Internal Affairs Bureau ("IAB"), and presenting its findings in its Annual Report.

6

42. Since its inception, the Commission has emphasized the importance of appropriately disciplining officers who make false statements. On the basis of the Commission's recommendations, the NYPD adopted a False Statement Policy (*see* NYPD Patrol Guide Section 203-08) that mandates termination of officers who intentionally make false official statements regarding a material matter, unless exceptional circumstances exist.

43. As the Commission stated in its 2013 Annual Report, "Consistent application of the false statement policy is of utmost importance. It not only enables members of the service to know what they can expect if they make false statements, but it also sends a clear message to members of the service, as well as the public, that the Department will not tolerate such conduct" (pg. 74).

44. The Commission analyzes false statements in official criminal court documents, including supporting depositions, criminal court complaints, summonses, and affidavits. False statements in such documents are of paramount importance because they have the potential to unjustly deprive persons of their liberty and to destroy the lives of innocent people.

45. Despite the importance of appropriately identifying and punishing officers who make false statements, the NYPD rarely imposes discipline consistent with its stated policy of terminating officers.

46. Indeed, the gap between its practice and policy is so wide as to make the NYPD's False Statement Policy a sham.

47. Over the past twelve years, in its Annual Reports, the Commission has analyzed numerous forms of false statements and has consistently found that the NYPD

"fail[s] to follow its false statement policy"; "fail[s] to charge the subject officer with making a false statement although such a charge appear[s] appropriate"; levies "other similar charges…to avoid the imposition of the False Statement Policy's requirement of termination"; and creatively, and without justification, skirts the requirement of termination.

48. In the 2014 Annual Report, the Commission examined ten cases involving false statements in sworn court documents; in seven of those cases, the subject officers were found guilty by making false statements but not separated from the police department.

49. In its 2015 Report, the Commission found that the NYPD rarely brought charges under the False Statement provision. "Instead," the Commission reports, "the Department used other Patrol Guide sections to allege misconduct relating to false statements" (pg. 103) – sections which do not carry a presumption of termination.

50. The Commission's 2017 Report found that the NYPD has been charging officers with making false official statements in far fewer instances than facts and circumstances seem to warrant.

51. In the specific context of fabricated court documents that falsely accuse people of wrongdoing, the Commission has regularly found grossly inadequate punishments, resulting in guilty officers forfeiting vacation days (usually no more than 30 days) but rarely losing their jobs.

52. Such findings – which expose the gap between the NYPD's False Statement Policy and practice – can be found in virtually every Annual Report issued by the Commission.

53. And there is no sign of improvement.

54. The Commission's June 2022 Report (its Twentieth Annual Report) noted that NYPD "policy has long called for termination in cases of intentional and material false statements unless 'exceptional circumstances' existed. In practice, however, termination has rarely been imposed" (pg. 77). This Report added: "[W]e not uncommonly see cases where 'the cover-up is worse than the crime,' yet the cover-up, which sometimes involves multiple officers, is not treated with appropriate seriousness" (*id.*). "In our view, the [New York City Police] Department's past practice of not seeking termination has not only minimized the seriousness of intentional lies but has, as a practical matter, incentivized officers to lie in hopes that even if their dishonesty is provable, they will still keep their jobs" (*id.* at 78).

55. The Commission's 2022 Report also exposes how the NYPD continues to creatively and unjustifiably skirt its own False Statement Policy: "As in past review periods, the Commission continued to find that instead of charging officers with making false official statements pursuant to the false statement policy found at Patrol Guide §203-08, the Department frequently charged officers under Patrol Guide §203-10(5), which prohibits 'conduct prejudicial to the good order, efficiency, and discipline to the Department" because the latter section does not carry a termination presumption (*id.* at 78-79). "[W]hen misconduct involves an intentional false statement, and is charged under this alternative provision – especially when the statement was made during an official interview – we view this as a *deliberate circumvention of the termination policy* and we continue to object" (*id.* at 79) (emphases added). "The Commission has repeatedly raised this issue directly with representatives of the Department and in its

annual reports" (*id.* at 79 n. 125).

56. As in earlier reports, the Commission's 2022 Report analyzed the NYPD's charging decisions against lying officers and found such officers to be inadequately punished – sending a "clear message that…blatantly lying to IAB is not serious enough to warrant dismissal" and "encourag[ing] officers to lie rather than reinforcing the message that lies to investigators will not be tolerated." *Id*. at 86.

57. To make matters worse, the instances of false statements investigated by the IAB and analyzed by the Commission are a tiny fraction of the total instances of false statements that occur within the NYPD. The officers who were caught fabricating statements were unlucky – they were captured on videotape; a civilian reported them; their lies were unwittingly exposed – but most dishonest police officers know they can lie and get away with it.

**"TESTILYING"**

58. On March 18, 2018, the New York Times published an article by Joseph Goldstein called "'Testilying' by Police: A Stubborn Problem," detailing the pervasive and largely ignored problem of police perjury. "Behind closed doors, we call it testilying," said NYPD officer Pedro Martinez in an interview for the article.

59. The article states: "An investigation by the New York Times found that on more than 25 occasions since January 2015, judges or prosecutors determined that a key aspect of New York City police officer's testimony was probably untrue. The Times identified these cases – many of which are sealed – through interviews with lawyers, police officers and current and former judges." Moreover, "[t]he 25 cases identified by The Times are almost certainly only a fraction of those in which officers have come

under suspicion for lying in the past three years." "Still, the cases identified by The Times reveal an entrenched perjury problem several decades in the making that shows little sign of fading." The purpose of the perjury was "aimed at tilting the scales toward guilt."

**NYPD PROTECTS AND PROMOTES LYING OFFICERS**

60. On March 19, 2018, the New York Times published another article by Joseph Goldstein entitled "Promotions, Not Punishments, for Officers Accused of Lying," reiterating the findings of the Commission and detailing a "culture of dishonesty."

61. The article states: "Of the 81 cases in which a civilian review board [the CCRB] found an officer had lied, the Police Department pursued 'false statement' charges in only two." In the other 79 cases, the NYPD found no wrongdoing or found the officer guilty of lesser misconduct.

62. The article also notes a problem with transparency and accountability when it comes to the NYPD's false statement policy: the NYPD is not required to tell the CCRB if it takes action against lying police officers. Thus, while the CCRB is aware of the 81 cases it has tracked since 2010, it – along with the public at large – is oblivious to the total number of cases in which officers have been found to lie and what their punishments are.

63. So while the NYPD may publicly extol its professionalism and integrity control, the NYPD cannot be trusted. Its indifference to truthfulness by its own rank and file – coupled with a lack of full transparency about how it handles lying officers – makes the department as a whole unworthy of trust.

64. The New York Times is just one of many publications describing the ongoing

cancer of NYPD mendacity within the criminal justice system.  *See e.g.*, "The Police Lie. All the Time.  Can Anything Stop Them?" by Mark Joseph Stern (August 4, 2020) (available at: https://slate.com/news-and-politics/2020/08/police-testilying.html); "Damaging NYPD Lies in Prominent Case of Teenager Uncovered" (March 8, 2022) (available at:  https://justicenotfear.org/debunk/nypd-lies-teenager/); "Reforming the NYPD and its Enablers who Thwart Reform" by Joel Berger, 55 New Eng. L. Rev. 1 (2020) (available at:  https://www.newenglrev.com/v55-special/reforming-the-nypd); "The Hard Truth About Cops Who Lie" (Oct. 13, 2015) by Robert Lewis and Noah Veltman (available at:  https://www.wnyc.org/story/hard-truth-about-cops-who-lie/).

**FAILURE BY THE CITY TO FIX THE CULTURE OF MENDACITY**

65. Defendant City has turned a blind eye to the tens of thousands of criminal cases which are dismissed each year in the Criminal and Supreme Courts of Defendant City; has failed to study how many of those dismissals were due to baseless, fabricated charges; and has failed to proactively look for patterns of fabrication and identify false charges that should have never been brought.

66. Defendant City has no system by which to proactively identify mendacious officers.

67. In response to the "Testilying" phenomenon, for example, the City has failed to create any system for how prosecutors should document and keep track of internal evaluations of officer dishonesty.  *See* "When Prosecutors Bury NYPD Officers' Lies" (*Gothamist)*, by George Joseph and Ali Winston (Sept. 17, 2019) ("Interviews with more than a dozen former prosecutors from Brooklyn, the Bronx, Queens, Staten Island, and Manhattan DA's offices, disclosure letters from the Manhattan DA's office, and a review

of numerous cases suggests internal systems to track police misconduct are haphazard at best, and intentionally negligent at worst.").

68. In the last twelve years, the number of NYPD investigations into police officers making false statements on criminal court accusatory instruments that did not arise from civilian complaints was *zero*.

69. The inadequacy of the NYPD's supervision and discipline with respect to dishonesty in the filing of criminal charges is exacerbated by the pressure on police officers to meet arrest quotas, or "performance goals."

70. Because arrests are rewarded, while making false arrests and fabricating charges go largely unpunished, police officers have felt incentivized to engage in false arrests and to fabricate criminal charges.

71. Such perverse incentives become particularly destructive in the hands of dishonest, undisciplined, unsupervised officers, such as the individual defendants.

72. Through the data cited herein along with hundreds of civil rights lawsuits alleging fabrication every year, the policymakers of Defendant City have been aware of the NYPD's practice of insufficiently punishing – and thereby encouraging – the falsification of criminal charges.

73. By doing nothing about this practice, the City has demonstrated deliberate indifference to the rights of its residents.

74. The notion of police officers lying, cheating, fabricating, manipulating, and misleading has become so accepted and commonplace within the NYPD that the pursuit of justice has become subverted and degraded.  Police officers must operate in a police culture so truth-sick and cynical that their morale and morality are crushed.  NYPD

officers see firsthand how roguish and dishonest behavior is rewarded within their ranks. The negative incentives created by this culture of mendacity threaten the safety, welfare, and liberty of every resident.

**DAMAGES**

75.     As a direct and proximate cause of the said acts of the Defendants, Plaintiff suffered the following injuries and damages:

      a.  Loss of liberty;

      b.  Physical pain and injury;

      c.  Emotional distress, degradation, and suffering.

## SECTION 1983 CLAIMS

## FIRST CLAIM

### False Arrest Under Section 1983

76.     Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein.

77.     By the actions described above, Defendants deprived Plaintiff of their Fourth Amendment right to be secure in their person against unreasonable searches and seizures, specifically their right to be free from false arrest.

78.     As detailed above, the individual defendants intentionally arrested and detained Plaintiff without probable cause, without a warrant, without privilege or consent.

79.     As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiff sustained the damages and injuries hereinbefore alleged.

## SECOND CLAIM

### Excessive Force Under Section 1983

80. Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein.

81. By the actions described above, the individual defendants deprived Plaintiff of their Fourth Amendment right to be free of unreasonable or unwarranted restraints on personal liberty, specifically their right to be free from excessive and unreasonable force.

82. As a direct and proximate result of aforementioned conduct of the defendant officers, Plaintiff sustained the damages and injuries hereinbefore alleged.

### THIRD CLAIM

**Malicious Prosecution Under Section 1983**

83. Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein.

84. By the actions described, the individual defendants deprived Plaintiff of their Fourth Amendment right to be free of unreasonable or unwarranted restraints on personal liberty, specifically their right to be free from malicious prosecution.

85. The individual defendants intentionally and maliciously initiated a criminal prosecution against Abbott without probable cause – a prosecution that terminated in Plaintiff's favor when all charges against them were dismissed.

86. As a direct and proximate result of the aforementioned conduct of the individual defendants, Plaintiff sustained the damages and injuries hereinbefore alleged.

### FOURTH CLAIM

**Denial of Right to Fair Trial Under Section 1983**

87. Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein.

88. By the actions described, Defendants deprived Plaintiff of their Fourth, Fifth, Sixth, and Fourteenth Amendment rights to a fair trial.

89. The individual defendants forwarded fabricated information to the Manhattan District Attorney's Office.

90. As a direct and proximate result of the aforementioned conduct of the individual defendants, Plaintiff sustained the damages and injuries hereinbefore alleged.

## FIFTH CLAIM

### Substantive Due Process Under Section 1983

91. Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein.

92. By the actions deprived above, Defendant Officer Jane Doe deprived Plaintiff of their Fifth and Fourteenth Amendment right to substantive due process when she flagrantly violated their privacy by watching them use the bathroom – conduct so outrageous that it may fairly be said to shock the contemporary conscience.

93. As a direct and proximate result of the aforementioned conduct of the individual defendants, Plaintiff sustained the damages and injuries hereinbefore alleged.

## SIXTH CLAIM

### Failure to Intervene Under Section 1983

94. Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein.

95. Each and every individual defendant had an affirmative duty to intervene on Plaintiff's behalf to prevent the violation of their constitutional rights by other law enforcement officers.

96. The individual defendants failed to intervene on Plaintiff's behalf to prevent, end, or truthfully report the violations of their constitutional rights despite knowing about such violations and having had a realistic opportunity to do so.

97. As a direct and proximate result of the aforementioned conduct of the individual defendants, Plaintiff sustained the damages and injuries hereinbefore alleged.

## SEVENTH CLAIM

### Municipal Liability Under Section 1983

98. Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein.

99. By the actions described, the Defendant City deprived Plaintiff of their Constitutional rights through its failure to train, supervise, and discipline malicious and mendacious officers; and through its indifference to a culture of dishonesty among law enforcement officers who wield considerable power over the lives of everyday residents.

100. As a direct and proximate result of the acts of Defendant City, Plaintiff sustained the damages and injuries hereinbefore alleged.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands the following relief jointly and severally against the Defendants:

    a. An order awarding compensatory damages for Plaintiff Trasonia Abbott in an amount to be determined at trial;

    b. An order awarding punitive damages in an amount to be determined at trial;

      c.      A court order, pursuant to 42 U.S.C. § 1988, that Plaintiff is entitled to reasonable attorney's fees, costs and disbursements; and

      d.      Such other and further relief as this Court may deem appropriate.

DATED:    New York, New York        CYRUS JOUBIN, ESQ.
               June 18, 2023                43 West 43rd Street, Suite 119
                                                    New York, NY 10036
                                                    (703) 851-2467
                                                      joubinlaw@gmail.com
                                                      Attorney for Trasonia Abbott